RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 04a0341p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANTHONY BOONE,

*Plaintiff-Appellant,*

v.

No. 03-3841

PHILLIP SPURGESS a/k/a PHILIP SPURGUS et al.,
*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00871—Algenon L. Marbley, District Judge.

Argued: August 11, 2004

Decided and Filed: October 4, 2004

Before: SILER, MOORE, and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:** Lisa T. Meeks, NEWMAN & MEEKS CO., Cincinnati, Ohio, for Appellant. John T. McLandrich, MAZANEC, RASKIN & RYDER CO., Cleveland, Ohio, for Appellees. **ON BRIEF:** Lisa T. Meeks, NEWMAN & MEEKS CO., Cincinnati, Ohio, for Appellant. John T. McLandrich, MAZANEC, RASKIN & RYDER CO., Cleveland, Ohio, Gordon Bradley Hummel, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees.

MOORE, J., delivered the opinion of the court, in which COLE, J., joined. SILER, J. (p. 10), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Anthony Boone ("Boone") appeals from the district court's grant of summary judgment on his Fourth and Fourteenth Amendment claims against Defendants-Appellees Philip Spurgus[1] ("Spurgus"), Scott Moyer ("Moyer") and Jerome Darfus

---

[1] While the complaint and, as a result, the docket list the defendant's name as Phillip Spurgess, this is a misspelling. Appellee Spurgus's Br. at 3. The correct spelling will be used throughout this opinion.

("Darfus").**2** Boone was involved in a minor traffic accident with Spurgus, an off-duty police officer; responding to the scene, Moyer and Darfus placed Boone in the back of their squad car and then found a gun on the floor of Boone's vehicle. Boone was then arrested and taken to the county jail, where he either refused or was not given medical care. He filed suit against Spurgus, Moyer, and Darfus, alleging violations of his Fourth and Fourteenth Amendment rights. The district court granted summary judgment on the merits for defendants on Boone's three claims: unlawful search of Boone's car; preferential treatment for Spurgus in violation of equal protection; and unlawful denial of medical attention. While the two latter claims fail, a material issue of fact remains as to whether the search of Boone's car was unlawful. The decision below is therefore **REVERSED** with respect to the Fourth Amendment search claim and **AFFIRMED** in all other respects.

## I. BACKGROUND

As the non-moving party, it is Boone's version of the facts we must follow. On the morning of September 17, 1999, Boone was driving northbound on Cherry Street in Lancaster, Ohio, and pulled up behind Spurgus, an off-duty Columbus police officer, at a stoplight at an intersection. When the light turned green, Boone and Spurgus both accelerated; without warning, Spurgus stopped short, and Boone's car struck his pickup truck. Boone maintained that at no time did Spurgus's turn signals or brake lights come on. Spurgus then exited his car, yelling obscenities at Boone and indicating that he was upset because his children were in the car. Boone had put his car in park, and opened his glove compartment in anticipation of an accident report. As he did that, he glanced down to ensure that the .45-semi-automatic weapon that he had secured in a well underneath the driver's seat was still in the well, concealed from view by a flap hanging down from the back of the seat. Boone testified that he "remember[s] . . . clearly" that the .45 was not exposed at that time. Joint Appendix ("J.A.") at 136 (Dep. of Anthony Boone). Stretched across the front passenger compartment, Boone looked up to see Spurgus at the driver's door; Spurgus then "cracked [Boone] on the left side of [his] head." J.A. at 125. Boone then momentarily lost consciousness, and drifted in and out of consciousness for the next several minutes. Spurgus continued beating Boone, pinning him to the ground; while Boone at one point in his deposition states that "next thing I remember, I was in the back seat of the cop car with handcuffs on," he later describes in much more detail subsequent events. J.A. at 126.

Boone stated unequivocally that he did not move his car after the accident; instead, he describes being picked up off the ground by the first officer arriving from the Lancaster Police Department, then handcuffed behind his back against the car, and then placed in the backseat of the police cruiser. Boone also testified that Spurgus identified himself as an off-duty Columbus police officer "[w]hen the police very first arrived on the scene." J.A. at 130-31. While in the back of the police car, Boone saw Spurgus talking to Lancaster Police officers Darfus and Moyer, and then Boone saw his car being searched by Darfus and Moyer. At some point, Boone's car had been moved off the street into a driveway, but Boone stated that he "can say with absolute certainty that [he] didn't move [his] car." J.A at 126. After the discovery of the .45-semi-automatic weapon and the subsequent full search of Boone's car, which additionally revealed a .32-revolver in a storage compartment in the driver's door, Moyer came up to the side of the cruiser and said to Boone, "You sure know how to pick them." J.A. at 140. Boone had stolen the .45 from his former employer; both guns were fully loaded at the time of the accident. Boone complained to the officers that "it was just an accident, and [Spurgus] had no right to beat the s*** out of me the way he did." J.A. at 141. Boone also asked for medical attention. When Boone asked why Spurgus was not being arrested, Moyer said that Boone would "have to look into that after [he] . . . went to jail or something like that." J.A. at 142.

Boone was taken to the county lockup, where he was placed in a cell, and where he claims he did not receive medical attention. As part of Boone's response to the defendants' motions for summary

---

**2** Darfus's first name is spelled "Jarome" in the complaint, but "Jerome" throughout his appellate brief. Presumably, the former is another misspelling.

judgment, he submitted an affidavit from Margaret Evans, a resident of Cherry Street, who saw the altercation but not the initial accident from her window. She saw "a large man walking to the car behind his blue truck," presumably Spurgus, who "threw his fist in the window and hit the little guy," presumably Boone, "as soon as he got near the window." J.A. at 118. Then, Spurgus "pulled the little guy out of the car and started beating on him." J.A. at 118. A bystander asked Evans to call the police; when they arrived "the big guy was sitting on the little guy, still beating on the little guy." J.A. at 119.

Boone was charged with two counts of carrying a concealed weapon and one count of felony theft. He pleaded guilty to the theft charge, and the other charges were dismissed; he was sentenced to six months in prison.

The key differences between Boone's account and that of the other parties is that: 1) Spurgus claims that Boone moved his own car subsequent to the time Boone claims that he ensured his gun was out of sight; 2) Moyer claims that he put Boone in the backseat of the police car because Boone was yelling during Moyer's attempts to interview Spurgus, that he didn't pat Boone down, and that he didn't place Boone in handcuffs initially; and 3) Moyer, Darfus, and Spurgus all claim that Boone's weapon was in plain view on the floor of his car, thus giving the police license to search his vehicle.

Boone filed an action in the United States District Court for the Southern District of Ohio on September 12, 2001, against Spurgus, Moyer, and Darfus. All three defendants, Moyer and Darfus together and Spurgus separately, moved for summary judgment. They moved for summary judgment both on the merits and on the basis of qualified immunity; the motions for summary judgment on the merits were granted.

## II. ANALYSIS

### A. Standard of Review

This court reviews the grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party. *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 543-44 (6th Cir. 2003).

### B. Fourth Amendment Claim: Illegal Search[3]

Boone argues that the search of his automobile resulting in the discovery of the .45 was in violation of the Fourth Amendment, and that his subsequent arrest was illegal as a result. Automobiles, while generally exempt from the warrant requirement, are usually not searchable except upon probable cause that evidence will be discovered therein. Two justifications are offered by Moyer and Darfus for the search.[4]

---

[3] Boone and Spurgus contest vigorously on appeal whether Spurgus acted under color of state law when he identified himself as an off-duty police officer to Moyer and during subsequent events. Because Boone has not demonstrated a set of facts where any actions taken subsequent to that point by Spurgus under color of state law would constitute a violation of Boone's Fourth Amendment right against unlawful seizures or of his right to equal protection of the laws, we decline to decide this issue.

[4] At oral argument, counsel for Moyer and Darfus also attempted to argue that issue preclusion from Boone's plea of guilty to a theft charge in Ohio state court would apply. Moyer and Darfus did not argue this affirmative defense either in their motion for summary judgment before the district court or in their appellate brief; were the issue waived, however, we would remain unconvinced. We apply the preclusion law of the rendering court. Under Ohio law, "The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different." *State ex rel. Stacy v. Batavia Local Sch. Dist. Bd. of Educ.*, 779 N.E.2d 216, 219 (Ohio 2002) (quoting *Fort Frye Teachers Ass'n, OEA/NEA v. State Emp. Relations Bd.*, 692 N.E.2d 140, 144 (Ohio 1998)). The legality of the search of Boone's car was not "actually and directly at issue" in Boone's state court proceedings, as he pleaded guilty and did not move to suppress evidence. Moreover, Ohio state courts generally frown upon the use of criminal proceedings to estop parties in subsequent civil proceedings. *See, e.g., State ex rel.*

First, they claim that the gun was in plain view, the reasoning relied upon by the district court. The plain-view exception permits a warrantless seizure where "(1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and (3) the officer has a lawful right of access to the object itself." *United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003). They also argued both in the district court and in this court that Moyer had authority to conduct a limited search of Boone's car for weapons under the authority of *Michigan v. Long,* 463 U.S. 1032, 1049-50 (1983), which allows such a search during a traffic stop.

The plain-view exception would apply if, as Moyer and Spurgus testified, Darfus could see from the passenger window the .45 peeking out from beneath the driver's seat. The other elements of the exception are satisfied: Darfus was lawfully positioned outside of Boone's car, and the incriminating character of the gun was immediately apparent because under Ohio law at the time of the offense, it was illegal to transport a loaded firearm in a car "in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle," or an unloaded firearm that was not "[i]n a closed package, box or case," "a compartment that can be reached only by leaving the vehicle," "[i]n plain sight and secured in a rack or holder made for the purpose," or "[i]n plain sight with the action open or the weapon stripped." Ohio Revised Code Ann. § 2923.16(B), (C) (Anderson 1999). Under everyone's version of the facts, Boone was attempting to conceal the .45 under the driver's seat, and the position of the gun when it was allegedly seen by Darfus and Moyer — "peeking out" from underneath the seat — made the attempted concealment immediately apparent. Therefore, even if the firearm was unloaded, it was not "in plain sight" under the Ohio statutory definition, and no contention has been made that the action was open or the weapon stripped, or that "the firearm is of a type on which the action will not stay open or which cannot be easily stripped." § 2923.16(C)(4). The firearm was therefore obviously incriminating because of the illegal manner in which Boone was transporting it. The final requirement, that the officer have a lawful right of access to the object, is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances, *see United States v. Chaar*, 137 F.3d 359, 363 n.6 (6th Cir. 1998), but does not bar the seizure of evidence in a parked car, *see, e.g., Bishop*, 338 F.3d at 627-28. The difference between "lawfully positioned" and "lawful right of access" is thus that the former refers to where the officer stands when she sees the item, and the latter to where she must be to retrieve the item. *See Horton v. Cal.*, 496 U.S. 128, 137 & n.7 (1990).

The first factor raises a question of material fact, however: Boone testified that after the accident, the gun was still under the driver's seat, and that he never moved his car from its post-accident position; Moyer testified that when he showed up on the scene, the cars had been moved to a driveway; and Spurgus testified that Boone moved his own car, and that Spurgus "never got in [Boone's] car." J.A. at 23. Boone, Spurgus, and Moyer all agreed that the cars were moved by the time Boone's car was searched. Boone also submitted photographic evidence, of a well under the driver's seat and a flap over the well, which he claims demonstrates that it would be impossible for the gun to slide out from under his car's seat. Boone additionally testified to the physical layout of his car, and "[a]bsolutely" rejected the contention that the car's movement could have dislodged the firearms. J.A. at 135-36. Boone's testimonial and photographic evidence that the gun was hidden when he last was in his car after the collision, and that the gun would not have been easily dislodged from its hiding place, are sufficient to create a material issue of fact on his Fourth Amendment claim of an illegal search of his car.

The applicability of the *Michigan v. Long* exception — an extension of the rule announced in *Terry v. Ohio*, 392 U.S. 1 (1968), that an officer with reasonable suspicion to detain a suspect can conduct a brief pat-down search to guarantee that the suspect is unarmed, to permit a search of a suspect's vehicle — is also not determinable without resolving disputed issues of fact. In *Long*, the Court held

---

*Ferguson v. Court of Claims of Ohio*, 786 N.E.2d 43, 48 (Ohio 2003).

that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. *See Terry*, 392 U.S., at 21. "[The] issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*., at 27.

*Long*, 463 U.S. at 1049-50 (footnote omitted). The Court also indicated that an officer could search a vehicle even if she was preparing to terminate the detention of the suspect, as it was possible that the suspect would return to his car and then use the weapon. *Id.* at 1051-52 (Search is permissible even when suspect is already under control of officers, in part because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."). Therefore, if Moyer and Darfus had lawfully detained Boone, and they had grounds for reasonable suspicion that Boone had weapons in his car, they could have conducted a search of the interior of his automobile, regardless of the plain-view rule. It seems likely that Moyer reasonably detained Boone in the first instance, and Boone does not challenge on appeal his initial detention as a Fourth Amendment matter. Both Boone and Spurgus were in a physical altercation and had to be separated, and Moyer chose to detain Boone in order to accomplish that goal. Moyer had reasonable suspicion at that point that Boone was guilty of some degree of assault. Spurgus claims that prior to Moyer's arrival, Boone had threatened to shoot Spurgus, and that once Moyer arrived, Spurgus told Moyer that Boone "has a gun in his car," and that Boone had threatened to shoot Spurgus. J.A. at 25. Moyer recounted that Spurgus told him that Boone had made threats, "advising [Spurgus] to get back in his truck or he would cap him," J.A. at 50, and that Moyer told Boone that he had probable cause to search Boone's car on that basis. Moyer did *not* testify, however, that Moyer was aware of Boone's alleged statement to Spurgus that Boone had a gun in his car.[5] Boone testified that he "did not say anything about shooting anybody," contradicting both statements described by Spurgus (the threat to shoot Spurgus, and the indication that Boone had a gun in his car). J.A. at 105. In *Michigan v. Long* itself, the Court noted a number of factors that "justified [the police] in their reasonable belief that Long posed a danger," including the lateness of the hour, the rural area in which Long was stopped, Long's excessive speed and his swerve into a ditch, Long's apparent intoxication, and the large hunting knife on the floor of his car. *Michigan v. Long*, 463 U.S. at 1050. In two prior cases, we have allowed protective searches under *Michigan v. Long* where police had prior reliable information that the drug-trafficking suspects they searched pursuant to a *Terry* stop always carried a firearm. *See United States v. Cochran*, 939 F.2d 337, 338 (6th Cir. 1991); *United States v. Paulino*, 935 F.2d 739, 747 (6th Cir. 1991). Here, it was broad daylight; Boone was detained pursuant to the investigation of a minor traffic accident and fistfight; he was not previously known to police; it was a residential street; there was no indication that Boone was intoxicated; and Spurgus communicated to Moyer only that Boone had threatened to shoot him — a threat Boone claims was never made. Whether or not Spurgus's bare statement that Boone had threatened to shoot him, or his testimony that Boone had stated that he had a gun in his car, would have been sufficient to justify a search of Boone's car based on the *Michigan v. Long* exception, a factual question remains as to whether or not Boone actually made any statements that would indicate that he had a gun in his car. This ground cannot justify summary judgment either.

## C. Fourteenth Amendment Claim: Equal Protection

Boone pleaded an equal protection violation arising out of the incident; he alleges that Moyer and Darfus conspired with Spurgus to conceal Spurgus's role as the aggressor in the fight between Boone and Spurgus, and to search illegally Boone's car in order to find incriminating evidence to discredit Boone. The

---

[5]Moyer also represented that he was planning to search Boone's car, either pursuant to Boone's consent, which he was attempting to get when Darfus spotted the .45, or based on his claimed probable cause. Moyer does not assert now that probable cause existed prior to the discovery of the gun.

district court below and the parties on appeal both rely heavily on *Fisher v. City of Cincinnati*, 753 F. Supp. 681 (S.D. Ohio 1990), which dealt with a similar factual situation — the plaintiff Fisher was involved in a traffic accident with an off-duty police officer, and Fisher alleged that officers of the Cincinnati police department had conspired to conceal the off-duty officer's intoxication and fault in the accident. The bulk of the *Fisher* opinion, however, concerns not the equal protection claim Fisher made, which the *Fisher* district court held survived the Rule 12(b)(6) motion made by defendants because defendants had not bothered to contest it, but instead Fisher's First Amendment access-to-the-courts claim. The district court therefore erred in demanding comparable evidence of conspiracy in deciding against Boone on this claim; however, even under proper equal protection standards, this claim fails.

On appeal, Boone takes issue with the district court's conclusion that he had not offered adequate evidence to demonstrate the presence of a conspiracy, and with the imposition of "a symmetry requirement." Appellant's Br. at 24. Spurgus responds that there is no evidence that would support a claim of denial of the right of access to the courts, while Darfus and Moyer respond that the symmetry requirement is appropriate to the resolution of the equal protection claim Boone actually made.

Reading Boone's somewhat opaque complaint generously to state a claim for denial of meaningful access to the courts, we conclude that the claim clearly fails. In order to state such a claim, the plaintiff must "present evidence that the [d]efendants' actions actually rendered a state court remedy ineffective." *Swekel v. City of River Rouge*, 119 F.3d 1259, 1260 (6th Cir. 1997). "[I]f a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts." *Id.* at 1262. In *Swekel*, the plaintiff's husband had been fatally struck by two cars, one of which was alleged to have been driven by a high-ranking police officer or his son. Swekel claimed that the initial officer who filed a report mentioning two cars was taken off the case; that the daily log sheet allegedly containing the record of two cars disappeared; that the police failed to perform forensic tests on the deceased's clothing; and that the police department told the responding officer not to attend the preliminary hearing, ignored anonymous tips pointing to the alleged second driver, and failed to disclose those anonymous tips even after the plaintiff communicated to the police department that she suspected the man in question. *Id.* at 1260-61. The district court dismissed her case sua sponte because she had failed to demonstrate that she could not succeed in a state court suit against the second driver. This court affirmed.[6]

In this case, Boone complains that Moyer and Darfus conspired with Spurgus to defeat Boone's assault claim against Spurgus. But Boone cannot show an effective denial of access to the courts: he knows the identity of his assailant, and Moyer and Darfus did not conceal any evidence or otherwise retard his efforts to accumulate proof of his claim. Moyer testified that Spurgus had told him that Boone had threatened to "cap" Spurgus, and from this Boone concludes that Moyer and Spurgus conspired to invent the threat against Spurgus. While this testimony is equally probative of Spurgus inventing the story on his own and relating it to Moyer, even under the most generous reading of the facts, Boone had not demonstrated how this threat invented by Moyer and Spurgus effectively denied him a state-court remedy against Spurgus. If the concealment of evidence and obstructionist behavior of police in *Swekel* was not

---

[6] The district court in *Fisher v. City of Cincinnati*, 753 F. Supp. 681, 685-87 (S.D. Ohio 1990), decided before *Swekel v. City of River Rouge*, 119 F.3d 1259, 1260 (6th Cir. 1997), suggests that *Joyce v. Mavromatis*, 783 F.2d 56 (6th Cir. 1986), inappropriately treats the access-to-the-courts claim as one alleging a deprivation of procedural due process, requiring a demonstration that post-deprivation state remedies are inadequate, rather than one of substantive due process, requiring no such demonstration. The *Fisher* court refused to follow *Joyce*, citing intervening Supreme Court and Sixth Circuit precedent. To the extent *Fisher* states a valid critique of *Joyce*, it is irrelevant because of *Swekel*'s subsequent reaffirmation of *Joyce*'s focus on the possibility of a state-court suit. It is not entirely clear that this is a valid critique, however; the court in *Joyce* very clearly separated out the procedural due process claim, holding it barred by the plaintiff's failure to demonstrate the inadequacies of post-deprivation remedies, and the First Amendment access-to-the-courts claim, noting that the defendants had not in fact deprived Joyce of meaningful access to the courts by revoking a traffic citation given to the police chief's son, because she had not demonstrated that "an Ohio court and jury would be unavailable and would not do justice between the parties." *Joyce*, 783 F.2d at 57. Whether or not *Joyce*'s relatively high bar of inadequateness is wise, it is clearly analytically different from the requirements of procedural due process claims.

sufficient to state a claim, the slight evidence here cannot suffice. There is no reason to believe that Boone could not have filed a state assault claim against Spurgus and have prevailed.

Moving on to Boone's equal protection claim, while Boone seems to challenge the failure of Moyer and Darfus to arrest Spurgus for assault, the district court was correct in requiring Boone to demonstrate that he and Spurgus were "similarly situated" — because Boone was not arrested for assault, that Spurgus was not arrested either cannot form the basis of an equal protection claim. However, when Moyer came on the scene, in Boone's versions of events, immediately upon Spurgus identifying himself as an off-duty police officer, Moyer handcuffed Boone and placed him in the back of the cruiser — thus treating him differently than Spurgus, possibly on the basis of Spurgus's status as an off-duty police officer. Boone's theory, then, that some equal protection claim might lie, does not necessarily fail because he was not arrested for assault; he was differently treated than Spurgus in a constitutionally cognizable way (i.e., Boone's seizure).

In order to make out an equal protection claim on the basis of selective enforcement, a plaintiff must demonstrate that someone similarly situated but for the illegitimate classification used by the government actor was treated differently. *See Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997). The Sixth Circuit has indicated that a claim for selective enforcement, while not limited to the traditional "suspect classes," *see id.* at 874, must nonetheless rest on membership in a class and a government actor's animus against that class. *See Futernick v. Sumpter Township*, 78 F.3d 1051, 1057 n.8, 1059 (6th Cir. 1996) (neither "[m]ere arbitrariness" nor "personal animosity" is forbidden as a basis for selective enforcement under the Equal Protection Clause). This precedent, however, is completely undercut by the cryptically brief decision in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), in which the Supreme Court held that allegations that a municipality's demands for a larger easement than usual before connecting plaintiff to the municipal water supply were "sufficient to state a claim for relief under traditional equal protection analysis." *Id.* at 565. Under *Futernick*, a plaintiff must demonstrate that a government actor had a bad reason for enforcing the law against her and not against a similarly situated party; under *Olech*, a plaintiff can also demonstrate that an actor had no reason at all — that the action had no rational basis. Presumably, the traditional rationale for disallowing selective enforcement claims — that police resources are limited, and that only a fraction of those guilty of criminal activity can be prosecuted — must survive *Olech* as a rational basis for police behavior; in order to make an equal protection selective enforcement claim, Boone must therefore demonstrate either that Moyer distinguished between Boone and Spurgus based on some bad reason, proving intent, *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002), or that Moyer had no rational reason to distinguish between Boone and Spurgus — a demonstration he is likely unable to make, as the need to isolate one combatant in a fistfight is rational, as is the need to, say, seize one combatant at a time. Moyer's actions were not completely arbitrary so as to make out an *Olech* class-of-one claim.

As to whether Boone can demonstrate that Moyer chose to seize him before restraining Spurgus for a bad reason, the question is closer. Given Boone's sequence of events, there is a colorable argument that he has demonstrated that Moyer may have made that choice because Spurgus identified himself as an off-duty police officer. Even if Boone has made out that factual case, however, the question remains whether that classification — between off-duty police and civilians — is a "bad reason" to distinguish between two combatants. It in fact seems like a not wholly irrational classification between two men in a fistfight in the short time period where Moyer was allegedly treating Boone differently — a time period which necessarily stopped when the gun was discovered. If Boone had been arrested for assault and Moyer not, we would see the case differently; had the detention of Boone and not Moyer stretched out beyond the discovery of the gun, we would see the case differently; but under the facts as recounted by Boone, we conclude that summary judgment on this claim was appropriate. We emphasize that our holding is confined to these factual circumstances; police officers do not have carte blanche to favor their off-duty colleagues.

**D. Medical Attention**

Boone alleges that he was denied medical care by Moyer at the scene of the accident and later, at the county detention center. Because Boone did not bring suit against his jailers, only Moyer's potential liability for the time he had custody of Boone is at issue in this case. Boone describes this as an Eighth Amendment claim, but the Eighth Amendment is the one constitutional source of protection against inadequate medical care while in the custody of the state to which Boone is definitely not entitled. *See Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003) ("The Eighth Amendment does not apply to pretrial detainees."). Moyer and Darfus make a better showing by identifying the Fourteenth Amendment's guarantee of substantive due process to pretrial detainees, but the question is perhaps more complicated than that. *Graham v. Connor*, 490 U.S. 386 (1989), holds that a specific constitutional guarantee — that all seizures be reasonable — trumps a more general guarantee — that all government action conform with substantive due process. In this circuit, a "seizure" under the Fourth Amendment continues at least "throughout the time the person remains in the custody of the arresting officers." *Johnson v. City of Cincinnati*, 310 F.3d 484, 492 (6th Cir. 2002). An allegation by Boone that Moyer had used excessive force against him after his arrest would therefore be a Fourth Amendment question: was the continuing seizure of Boone reasonable? A seizure can be "unreasonable" for any number of reasons, and the guarantee of reasonableness in the manner of a seizure does not seem to allow for a distinction between a claim that an officer used excessive force and a claim that the same officer denied medical care to a detainee. In *Graham* itself, the excessive force claim was partially based on the officers' refusal to provide medical care to a handcuffed suspect suffering from a diabetic attack. *Id.* at 389-90. At least one circuit has therefore applied the Fourth Amendment's guarantee of "reasonable" seizures to a claim that police failed to provide adequate medical care to a suspect in their custody. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595-96 (7th Cir. 1997). *But see Barrie v. Grand County*, 119 F.3d 862, 865-69 (10th Cir. 1997). None of our prior cases speak directly to this issue, although we have in the past used the Fourteenth Amendment even where the suspect was still technically "seized" under the continuing seizure doctrine, without noting the conflict. *See, e.g., Weaver*, 340 F.3d at 410; *Lily v. Watkins*, 273 F.3d 682, 685-86 (6th Cir. 2001). District courts in the circuit have split on the issue. *Compare Estate of Owensby v. City of Cincinnati*, No. 1:01-CV-00769, 2004 U.S. Dist. LEXIS 9444, *42-*60 (S.D. Ohio May 19, 2004) (using substantive due process) *with Alexander v. Beale St. Blues Co.*, 108 F. Supp. 2d 934, 940-41 (W.D. Tenn. 1999) (using reasonableness standard and relying on *Estate of Phillips*, 123 F.3d at 595-96). Ultimately, there seems to be no logical distinction between excessive force claims and denial of medical care claims when determining the applicability of the Fourth Amendment. Because we conclude that under either standard, Boone has not made out a claim, we do not decide this issue, but instead reserve it for a more appropriate case.

The evidence of the extent of Boone's injuries is scant; Boone testified that he had "cuts on the inside of [his] mouth," dizziness, disorientation, and impaired vision for two days; additionally, defendants submitted a "Medical Summary" from the Fairfield County Sheriff's Office, which indicated that Boone had a bump on the right side of his forehead, and abrasions on his head, neck, shoulder, and arms, although Boone "den[ies] he was ever seen by any medical person while [he] was in the county jail." J.A. at 41, 97. Boone also submitted to the defendants below, but inexplicably did not enter into evidence, Ohio State University Medical Center records, from a month after the incident, which Boone described in response to the defendants' discovery request as diagnosing him with neck and back strain and facial numbness and referring him to neurology. The Sheriff's Office medical summary also indicates that Boone received medical care at 16:25, or 4:25 p.m. on September 17, 1999[7] — at least six hours after the accident and

---

[7] While Boone denies that the summary is truthful, it is the only evidence in the record that even remotely suggests how long Boone would have had to wait to receive medical treatment if Moyer insisted that Boone wait until he was booked at the jail.

ensuing fight are alleged to have happened.[8] If Boone had submitted evidence that 1) he had suffered some injury serious enough to warrant prompt medical care in his fight with Spurgus; 2) that an officer in Moyer's position should have known the extent of those injuries and approximately how long it would take for Boone to receive medical attention at the jail; and 3) that it was objectively unreasonable to make someone with the injuries Boone had suffered wait that long to receive treatment, he would likely have made out a constitutional claim under the Fourth Amendment. If he had submitted evidence that Moyer's actions in denying treatment were not merely objectively unreasonable, but deliberately indifferent, he would have made out a claim under the Fourteenth Amendment's guarantee of substantive due process. However, Boone did not submit evidence in the district court from which a trier of fact could determine the seriousness of his injury, or the soundness of Moyer's actions in temporarily refusing treatment, and therefore Boone fails to make out a claim on the merits.

### III. CONCLUSION

Because a material issue of fact remains as to whether the firearm would have been visible from outside the car, we **REVERSE** that portion of the district court's decision granting summary judgment to Moyer and Darfus on Boone's Fourth Amendment illegal search claim. In all other respects, the district court's judgment is **AFFIRMED.**

---

[8] In his appellate brief, Boone refers to the time of the accident as "10:00 a.m." Appellant's Br. at 4. During Boone's deposition, in asking why Boone was carrying the firearms in his car, opposing counsel refers to the time of day as "nine in the morning." J.A. at 135. Boone notes in that deposition that he left his home in Lancaster for Zanesville at 7:30 in the morning, and was returning home at the time of the accident; that round-trip is approximately ninety miles.

---

### CONCURRING IN PART, DISSENTING IN PART

---

SILER, Circuit Judge, concurring in part and dissenting in part. I concur in all aspects of the majority's opinion except on the alleged illegal search of Boone's automobile. I also concur in the majority's analysis of the applicability of *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983). However, I take exception with the majority's conclusion that there is an issue of fact on whether Darfus or Moyer could have seen the handgun in plain view when looking through the window of Boone's vehicle. As the majority contends, Boone made sure that the pistol was still hidden at the time that he got out of his car. If the officers had looked through the window of the car while it was still located where Boone had left it in the street, there would have been an issue of fact as to whether an officer could have seen the pistol poking out from under the seat.

However, someone moved the car from the time that Boone got out of it in the street and the time Officers Moyer and Darfus looked through the car window and saw the firearm. There is a question concerning who moved the vehicle, but the parties at oral argument said that it was not material. Therefore, disregarding who moved the car, we must determine whether there is a dispute of the fact that Moyer and Darfus said that they could see the handgun poking out from under the seat when they looked through the car window after the car had been moved. Both of them said that they saw the pistol, and Boone can only say that when he left the vehicle in the street, the weapon was concealed, so no one could have seen it then. Like the district court, I would find that Boone failed to show there was a genuine issue of material fact "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, I would uphold the district court's finding that there was no illegal search of the vehicle, because the firearm was observed in plain view by the officers. *See Texas v. Brown*, 460 U.S. 730, 740 (1983).