*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DIANE KNOTT,

*Plaintiff-Appellant,*

v.

No. 04-3045

MARK SULLIVAN et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 02-01103—Gregory L. Frost, District Judge.

Submitted: July 26, 2005

Decided and Filed: August 9, 2005

Before: MOORE and COLE, Circuit Judges; WISEMAN, District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** Douglas C. Boatright, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellees. Diane Knott, Glouster, Ohio, pro se.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Diane Knott ("Knott") appeals from the district court's order granting summary judgment in the underlying § 1983 action to Defendants-Appellees Mark Sullivan ("Sullivan"), Sheriff Vern Castle ("Castle"), Officer Steve Sedwick ("Sedwick"), Deputy Sheriff Allen Flickinger ("Flickinger"), Deputy Sheriff Brian Cooper[1] ("Cooper"), Deputy Sheriff Carl Williams ("Williams"), Deputy Sheriff Jeff Gura ("Gura"), and Officer Rodney Smith ("Smith") (collectively, "Defendants"). The gravamen of Knott's suit is that the Defendants violated her Fourth Amendment rights by searching her automobile and her residential property without a search warrant. For the reasons set forth below, we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for further proceedings.

---

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

[1]There appears to be some confusion as to whether this Defendant's name is "Brian Coper" or "Brian Cooper." For consistency purposes, we refer to this Defendant as "Brian Cooper."

1

## I.  FACTUAL AND PROCEDURAL HISTORY

On September 19, 2001, Diane Knott's son, Eric, reported to the Athens County Sheriff's department that he had discovered the body of David Malcolm while looking for ginseng root in a wooded area. Defendant Flickinger, an Athens County Deputy Sheriff, was placed in charge of the investigation and went to wooded area where David Malcolm's body had been found.  Eric was still present when Flickinger arrived at the scene, and Flickinger noticed that Eric was driving a blue 1988 Plymouth Horizon.

Flickinger then received a call that the body of David Malcolm's wife, Ruth, had been discovered at the Malcolm residence.  Flickinger went to the Malcolm residence and was approached by two witnesses. One of the witnesses stated that at around 2:30 a.m. that morning, he had heard a woman's scream and a rifle shot and that he had seen a blue vehicle leave the Malcolm residence shortly thereafter.  The witness also stated that the blue vehicle had a loud exhaust and that he thought he had seen Eric drive the same vehicle earlier in the day.  The witness further noted that he had been to the David Malcolm murder scene and that he had seen the blue vehicle parked there.  Flickinger contacted one of the officers at the David Malcolm site and was told that Eric and the blue vehicle were still at the scene.  Pursuant to Flickinger's direction, the officer obtained Eric's permission to start the blue vehicle and confirmed that it had a loud exhaust.  The vehicle was then impounded and taken to the Athens County Sheriff department's storage facility.  A license-plate check revealed that the vehicle was owned by Diane Knott.

At approximately 1:00 p.m. on September 21, 2001, Defendants Castle, Flickinger, Gura, Smith, and Williams went to the Knott residence.  Castle and Williams went to the back door of the Knott residence, Flickinger and Gura went to the front door, and Smith remained in the yard.  Diane Knott opened the back door of the residence and told Castle and Williams that her sons Eric and Brian were not at home; the two officers returned to their vehicle and left the scene.  Knott then went into the living room and discovered Flickinger and Gura, who had been let in by Knott's mother.  Flickinger and Gura told Knott that they were looking for her sons, asked her what her sons looked like, and asked what vehicle they were driving.  Gura then went back outside, and a few minutes later, Flickinger left the residence as well.  Gura and Smith were later seen looking at a pile of ashes located in the Knotts' yard near the garage.

Later that day, Eric Knott was arrested.  Upon returning home from the scene of Eric's arrest, Diane Knott discovered Defendants Castle and Williams pulling out of her driveway.  Knott asked Castle why he had returned to her residence, and Castle responded that he was looking for the gun that was used in David Malcolm's murder.  Castle told Knott to contact him if she located the gun, and Knott told Castle that he could search her residence if he wanted.

That evening, Diane and her husband Brett Knott were interviewed by Defendant Sedwick at the Athens County Sheriff's office.  Diane Knott was interviewed first, and after the conclusion of her interview, she left the Athens County Sheriff's office.  During Brett Knott's interview, the Athens County Sheriff's department received a telephone call reporting that men with guns were on the Knotts' property. After being told of the telephone call, Brett Knott signed a written consent-to-search form authorizing the search of his residence.  Joint Appendix ("J.A.") at 68 (consent form signed by Brett Knott on September 21, 2001 at 22:35 (i.e., 10:35 p.m.) authorizing search of 8768 St. Rt. 78, Glouster, Ohio).  Defendant Cooper, along with Deputy Sheriffs Cottrill, Taylor, Heater, and Fick went to the Knott residence to investigate the call.

Some time later, Flickinger prepared a warrant and affidavit to search the vehicle impounded at the scene where David Malcolm's body was discovered.  However, the vehicle description, license plate number, and vehicle identification number in the affidavit and search warrant referred, not to the 1988 Plymouth Horizon that had been impounded, but rather to a 1984 Dodge Hatchback owned by Knott's husband, Brett Knott. Joint Appendix ("J.A.") at 58 (Search Warrant) (identifying vehicle to be searched as "the automobile of Brett Knott, 1984 Dodge HB, Located at the ACSO garage, being described as 1984 Dodge HB Lic # BGC2270 Vin # 1B3BZ18C7ED338807"); J.A. at 59 (Search Warrant Affidavit) (same);

*see also* J.A. at 9 (Compl. ¶ 18) (listing 1988 Plymouth Horizon's vehicle identification number as 1P3BM1805JY223924 and license plate number as CPJ4005).  On September 27, 2001, Athens Court of Common Pleas Judge L. Alan Goldsberry authorized the search warrant, and the 1988 Plymouth Horizon was searched.  According to Knott's complaint, the Athens County Sheriff's department held the 1988 Plymouth Horizon for approximately one year and caused in excess of $3,500.00 in damage to the vehicle.

Eric Knott was eventually charged in the deaths of David and Ruth Malcolm.  During the criminal proceedings against Eric, Judge Goldsberry (who had issued the vehicle search warrant) ruled that evidence obtained from the search of the 1988 Plymouth Horizon had to be suppressed because the 1988 Plymouth Horizon was not the vehicle identified in the search warrant.  Record ("R.") 7, Exhibit 1 at 5 (July 10, 2002 Athens County Court of Common Pleas Decision on Motion to Suppress Evidence Seized From 1988 Plymouth Automobile and Journal Entry) (concluding that "the warrant, as obtained, clearly did not authorize the search of a 1988 Plymouth and the Court finds no cause for invoking the good faith, reasonable reliance exception to the exclusionary rule, as it was manifestly unreasonable for officers to use a warrant specifically describing one vehicle to search a completely different vehicle").

In November 2002, Diane Knott filed the instant § 1983 action against Defendants Castle, Williams, Smith, Gura, Cooper, Sedwick, and Flickinger alleging that they engaged in unconstitutional searches and seizures of her vehicle and residence.  Knott also filed suit against Defendant Mark Sullivan, the Athens County Commissioner.  Both sides moved for summary judgment, and the district court below granted the Defendants' motion.  Knott now appeals.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's order granting the Defendants' motion for summary judgment de novo.  *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  Summary judgment is proper if, when drawing all reasonable inferences in favor of the non-movant, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Johnson*, 398 F.3d at 873.  Thus, summary judgment in favor of the Defendants is not proper if the Defendants are not entitled to judgment as a matter of law, or if there is a genuine issue of material fact as to whether 1) Knott was "'depriv[ed] of a right secured by the Constitution or the laws of the United States, and 2) the deprivation was caused by a person acting under color of state law.'"  *Johnson*, 398 F.3d at 873 (quoting *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995)).

### B.  Vehicle Search

In their motion for summary judgment, the Defendants asserted that they should not face § 1983 liability for the search of Knott's 1988 Plymouth Horizon because the search was conducted pursuant to a valid warrant, albeit one containing some errors in the vehicle's description.[2]  The district court agreed, and entered summary judgment in favor of the Defendants on that basis.  We conclude, however, that the defects in the warrant executed by the Defendants are so grave that the Defendants are not entitled to summary judgment on the grounds that the search was conducted pursuant to a valid warrant.

---

[2]We note that the Defendants have not argued, either in their motion for summary judgment or in their brief on appeal, that they are immune from § 1983 liability because Knott's 1988 Plymouth Horizon could be searched without a warrant.  Thus, we consider here only whether the district court erred in characterizing the search of Knott's 1988 Plymouth Horizon as one conducted pursuant to a valid warrant.

### 1. Constitutional Validity of the Search Warrant

Because the Athens County Court of Common Pleas previously determined, in the context of ruling on a motion to suppress in Eric Knott's criminal trial, that the Defendants' search of Knott's 1988 Plymouth Horizon did violate the Fourth Amendment, we must decide, as an initial matter, what preclusive effect (if any) should be given to this prior state-court determination. Because Knott would have us give preclusive effect to an Ohio state-court determination, we look to Ohio's law of issue preclusion to resolve this question. *See McKinley v. City of Mansfield*, 404 F.3d 418, 428 (6th Cir. 2005). As this court has previously explained, Ohio's:

> "doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different."

*Boone v. Spurgess*, 385 F.3d 923, 927 n.4 (6th Cir. 2004) (quoting *State ex rel. Stacy v. Batavia Local Sch. Dist. Bd. of Educ.*, 779 N.E.2d 216, 219 (Ohio 2002)). Under Ohio law, the burden of demonstrating that these requirements have been satisfied rests with the party asserting that issue preclusion should apply. *See Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 985 (Ohio 1983).

The district court below concluded that preclusive effect should not be given to the state-court suppression order on two grounds. First, the district court ruled that issue preclusion should not apply because "[t]he general rule in Ohio is that a judgment in a criminal proceeding cannot operate as res judicata, or collateral estoppel, in a civil action to establish any fact determined in the criminal proceeding." J.A. at 20-21 (D. Ct. Op. at 7-8) (citing *State ex rel. Ferguson v. Court of Claims of Ohio, Victims of Crime Div.*, 98 Ohio St. 3d 399, 403-04 (2003)). Second, the district court also determined that giving preclusive effect to the Ohio trial court's suppression order would be improper because none of the parties in this case had been parties in the prior state-court criminal proceeding, and the Defendants had not had a full and fair opportunity to litigate their position as privies of the State of Ohio. In her brief on appeal, Knott has not addressed these arguments or otherwise explained why issue preclusion should apply in this case. *See Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 n.2 (6th Cir. 2005) (deeming issue not raised on appeal as waived) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310-11 (6th Cir. 2005)). Moreover, it does not appear that the district court's decision was in error. *See Boone*, 385 F.3d at 927 n.4 (noting that "Ohio state courts generally frown upon the use of criminal proceedings to estop parties in subsequent civil proceedings."); *cf. Shamaeizadeh v. Cunigan*, 338 F.3d 535, 546 n.4 (6th Cir. 2003) (in § 1983 suit, declining to collaterally estop defendant police officers from asserting the validity of a search because, although the police officers had testified at the suppression hearing, they had not received a full and fair opportunity to litigate the issue), *cert. denied*, 541 U.S. 1041 (2004). Thus, we decline to give preclusive effect to the state-court suppression order and instead consider de novo the constitutional validity of the search warrant.

The Fourth Amendment to the United States Constitution provides in part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. In determining whether a warrant describes with sufficient particularity the place to be searched, we consider: "(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." *United States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir.), *cert. denied*, 492 U.S. 918 (1989).

In the case at bar, the parties do not dispute the fact that the warrant and its supporting affidavit inaccurately described the vehicle to be searched. This court has previously ruled, however, that technical

inaccuracies in a warrant do not automatically render unconstitutional searches conducted pursuant to such a warrant. Rather, we must consider whether, given the circumstances of the particular case, there was a reasonable probability that another location could have been mistakenly searched because of the inaccuracies contained in the warrant. *See United States v. Durk*, 149 F.3d 464, 465 (6th Cir. 1998) ("The test for determining whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description is technically accurate in every detail, but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.") (internal quotation marks and citations omitted); *see also United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002).

Based on the record before us, we conclude that, in this case, the errors in the search warrant and affidavit were so extensive that there was a reasonable probability that the wrong vehicle could have been mistakenly searched. Here, virtually every descriptor of the vehicle included in the search warrant and accompanying affidavit was incorrect: the vehicle's make and model were wrong, the vehicle identification number was wrong, and the vehicle's license plate number was wrong. Indeed, the only portion of the description contained in the warrant that appears to have been correct is the statement that the vehicle was "[l]ocated at the ACSO [Athens County Sheriff's Office] garage." J.A. at 58 (Search Warrant); J.A. at 59 (Search Warrant Affidavit). The danger that another vehicle could be mistakenly searched is further heightened in this case by the fact that the erroneous information included in the search warrant and affidavit did (accurately) describe another vehicle owned by a member of the Knott family, which could have also been the target of a search as part of the ongoing investigation into the Malcolm murders.

Notwithstanding the extensive errors in the search warrant and affidavit, the district court concluded that the Defendants' execution of the search warrant was still constitutionally permissible because Defendant Flickinger, the police officer who prepared the search warrant and affidavit, also participated in the execution of the search. It is true that this court has previously upheld searches conducted pursuant to warrants listing incorrect addresses or property descriptions in part because the police officers involved in executing the search had also served as affiants or were otherwise familiar with the location to be searched. *See Pelayo-Landero*, 285 F.3d at 497; *Durk*, 149 F.3d at 466; *Gahagan*, 865 F.2d at 1499. However, we believe that the risk of misidentification created by the defective warrants in those cases was markedly less severe than is at issue in the case presently before us.

In *Gahagan*, we upheld the constitutionality of a search of a wood cabin with an address of 7577 Douglas Lake Road, even though the search warrant only listed the address 7609 Douglas Lake Road. In reaching such a conclusion, we explained that, although the address listed in the warrant did not include the cabin, the affidavit accompanying the warrant did clarify that the wood cabin was included as part of the premises to be searched. *See Gahagan*, 865 F.2d at 1492, 1497 (noting that information in the affidavit, including the statement that "'[a]lso located on the property is a single story wood frame log cabin-type structure painted dark brown in color,'" "sufficiently described both House B and Cabin #3 so that the executing officers could reasonably ascertain the premises to be searched" as including both structures). By contrast, in the case at bar, the affidavit accompanying the search warrant contains the same errors as those included in the search warrant, and the affidavit contains no additional information beyond that already in the warrant that would indicate to the executing officer that the 1988 Plymouth Horizon was the vehicle to be searched. Moreover, while in *Gahagan* we were presented with a search warrant that, on its face, authorized a more narrow search than the one actually conducted, in this case the defect in the warrant is not vagueness or narrowness but rather wholesale inaccuracy.

In *Durk*, we upheld a search of a residence, notwithstanding the fact that the warrant contained two errors: "(1) the transposition of the house numbers from 4216 to 4612, and (2) the description of [the defendant's] house as '3 houses to the east of Grandview' — in fact, it was three houses to the west of Grandview." *Durk*, 149 F.3d at 465. In so ruling, we noted that other portions of the warrant accurately described the residence to be searched and included a reference to a particularly unusual feature of the

property. *See id.* at 466 ("The warrant correctly identifies the house as a single-family red brick ranch home on the north side of Fulton street. Although brick, ranch style homes may be common in Shaw's neighborhood, the warrant also describes a more unusual feature: a ten by fifteen foot metal storage shed, the entrance of which is secured by a plastic tie."). Similarly, in *Pelayo-Landero*, we upheld the denial of a suppression motion brought by a defendant who claimed that the address for the mobile home that was searched was "in all likelihood 1412 Mae Collins Road, Lot #3," not 1418 Mae Collins Road as listed in the warrant. 285 F.3d at 497. In reaching such a conclusion, we noted that the defendant did not definitively assert that the address listed in the warrant was incorrect, and that even if the address had been wrong, the warrant included other information (such as "specific directions from an identifiable point to the mobile home park at 1418 Mae Collins Road," the color and trim of the trailer, the presence of a wooden deck, and the existence of "the number 954 displayed under a window air conditioner on the right end of the trailer") that pointed the police officers to the correct location. *Id.* In this case, on the other hand, the only accurate portion of the vehicle description included in the warrant is the fact that the 1988 Plymouth Horizon was stored in the Athens County Sheriff's garage. Such information may be of limited usefulness in identifying which particular vehicle is to be searched, however, given that many vehicles may be stored in the county garage at any one time, and the vehicles stored in the garage may change between the time the search warrant is issued and the time it is executed.

In sum, in this case we conclude (as did the state court) that, in light of the profound errors contained in the search warrant and affidavit, the search of Knott's 1988 Plymouth Horizon cannot be upheld as the lawful execution of a valid search warrant. Here, we are not presented with the mere transposition of digits in a license plate or vehicle identification number or a minor mistake in the description of one portion of the vehicle, but rather the wholesale inclusion of another vehicle's make, model, year, license plate number, and vehicle identification number. Indeed, the vehicle described in the search warrant was not simply just another vehicle, but rather one owned by the father of a person suspected of committing a double murder. Given these circumstances, there was more than a reasonable probability that the incorrect vehicle could have been searched, notwithstanding the fact that the affiant was involved in executing the search and the warrant noted that the vehicle was stored in the Athens County Sheriff's garage.

### 2. Invalidity of Warrant Clearly Established

Under the doctrine of qualified immunity, "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, although we have concluded that the warrant supporting the search of Knott's 1988 Plymouth Horizon was invalid, the Defendants are still entitled to qualified immunity if the constitutional invalidity of the warrant was not clearly established at the time the Defendants searched Knott's vehicle. "'If the law at that time was not clearly established, an official could not . . . fairly be said to "know" that the law forbade conduct not previously identified as unlawful.'" *Id.* at 698 (quoting *Harlow*, 457 U.S. at 818) (alteration in *Sample*). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

In light of the extensiveness of the search warrant defects at issue in this case, we conclude that the constitutional infirmity of the search warrant executed by the Defendants was clearly established at the time they searched Knott's 1988 Plymouth Horizon. It is true that, in certain cases, we have ruled that a search pursuant to a warrant that contains some ambiguity or minor, typographical errors may survive Fourth Amendment scrutiny because the affiant officer's participation in the execution of the search provides sufficient assurance that the wrong location will not be searched. Such cases, however, are the exception, not the rule, and do not change the fundamental Fourth Amendment requirement that a warrant "particularly describ[e] the place to be searched . . . ." U.S. CONST. amend. IV; *see Gahagan*, 865 F.2d at 1496 ("[T]he Fourth Amendment safeguard is designed to require a description which particularly points to a definitely

ascertainable place so as to exclude all others.") (internal quotation marks and citations omitted). Here, the search warrant obtained by the Defendants describes a vehicle completely different than the one that was ultimately searched. The only aspect of the warrant that was accurate was its statement that the vehicle to be searched was located in the Athens County Sheriff's garage; however, any number of vehicles may be stored at a police garage at any one time, so such a statement provides little in the way of a particularized vehicle description that would be sufficient to satisfy the strictures of the Fourth Amendment. Given that all of the specific vehicle characteristics (including the make, model, year, license plate number, and vehicle identification number) listed in the warrant described Brett Knott's 1984 Dodge Hatchback, in effect no search warrant was ever issued for Knott's 1988 Plymouth Horizon. The Fourth Amendment obviously forbids relying on a warrant to search one vehicle when all of the vehicle-specific descriptors refer to another vehicle, and thus we conclude that the constitutional invalidity of the search warrant at issue in this case was clearly established at the time Knott's vehicle was searched. *See Sample*, 409 F.3d at 699 (concluding that general standards of the Fourth Amendment clearly established the impermissibility of shooting a suspect who does not pose a serious threat to police officers and that the case at bar did "not present a novel factual circumstance such that a police officer would be unaware of the constitutional parameters of his actions").

### 3. Objectively Unreasonable Conduct

Finally, we conclude that the Defendants' reliance on the search warrant in this case was objectively unreasonable in light of the warrant's clearly established constitutional infirmity. *See Sample*, 409 F.3d at 700. Many of the errors contained in the search warrant (such as the vehicle's make, model, and license plate number) would be obvious to even the most casual of observers. Indeed, the Defendants' execution of the warrant notwithstanding these errors reveals either a blatant disregard for the terms of the warrant or utter negligence in failing to check that the vehicle to be searched is the one identified in the warrant. Thus, the district court erred in granting summary judgment to the Defendants on the basis that the search of Knott's 1988 Plymouth Horizon was pursuant to a valid search warrant.

## C. Residential Searches

In addition to challenging the search of her 1988 Plymouth Horizon, Knott also alleges that her Fourth Amendment rights were violated when the Defendants conducted searches of her residential property.[3]

### 1. Defendants Smith and Gura

Knott first appears to allege that Defendants Smith and Gura conducted an unconstitutional search of her property when they walked into her yard and inspected a mound of ashes. The district court below granted summary judgment to Defendants Smith and Gura, concluding that no search occurred given that Smith and Gura were permitted to approach Knott's residence in order to ask her questions and that the pile of ashes was not located in part of the residence's curtilage. We conclude, however, that there are genuine issues of material fact that make entry of summary judgment in favor of Defendants Smith and Gura inappropriate at this time.

When determining whether an area is subject to Fourth Amendment protection by virtue of being part of a home's curtilage, the ultimate question we must resolve is "whether the area harbors the intimate

---

[3]Knott does not appear to be challenging on appeal the district court's entry of summary judgment as it pertains to the search conducted after the telephone call claiming that persons with guns were on the Knott property. We note that the district court's entry of summary judgment with respect to this claim does not appear to be in error because there is no evidence suggesting that the consent provided by Diane Knott's husband, Brett Knott, was in any way invalid. *See United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir.) ("A search may be conducted without a warrant if a person with a privacy interest in the item to be searched gives free and voluntary consent.") (citing *Schneckcloth v. Bustamonte*, 412 U.S. 218, 219, 222 (1973)), *cert. denied*, 519 U.S. 848 (1996).

activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (internal quotation marks and citation omitted). In making this determination, we look to four factors to guide our inquiry: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id*. at 301.

The district court below concluded that the portion of the Knotts' property containing the ash pile did not constitute part of the residence's curtilage, noting that "no structure enclos[ed] the pile of ashes," there was "nothing to keep trespassers from observing or interfering with the ashes," and an "ash pile is not a part of the sanctity of Plaintiff's home." J.A. at 28-29 (D. Ct. Op. at 15-16); *see Oliver v. United States*, 466 U.S. 170, 178 (1984) ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."). We, however, do not find the issue to be so clear-cut. Based on our review of the record, we are admittedly somewhat unclear as to the precise location of the ash pile. The record seems to suggest that the ash pile may have been located in relatively close proximity to the Knotts' garage. Indeed, Defendant Smith described the area as part of the Knotts' "yard," J.A. at 73 (Smith Aff. ¶ 6), and Diane Knott noted during her deposition that the area was not overgrown with tall grass. J.A. at 47 (Diane Knott Dep. at 38) ("Q. Was there grass and stuff, tall grass in the yard? A. The grass wasn't tall, no."). *See Daughenbaugh v. City of Tiffin*, 150 F.3d 594 (6th Cir. 1998) (concluding that garage was included as part of curtilage and that entry into backyard constituted a search); *United States v. Jenkins*, 124 F.3d 768 (6th Cir. 1997) (concluding that backyard was included in curtilage of defendant's home). While the Knotts' property does not appear to have been encircled with fencing, it is unclear whether the trees or other geographical features of the Knotts' property created a reasonable expectation of privacy. Finally, although Defendant Smith indicated in his affidavit that "[t]he mound of dirt is visible from the public roadway," the Defendants do not claim to have initially spotted the ash pile from outside the curtilage. J.A. at 73 (Smith Aff. ¶ 6). Indeed, they ventured into the Knotts' backyard in order to investigate the pile of ashes. Thus, based on the scant information contained in the record regarding the physical layout of the Knott property and the location of the ash pile in comparison to the Knotts' mobile home and garage, we cannot conclude that there is no genuine issue of material fact as to whether the area involved was included within the curtilage of the Knott residence.

### 2. Defendants Castle and Williams

Knott also appears to challenge on appeal the district court's entry of summary judgment in favor of Defendants Castle and Williams with respect to their alleged search of the Knotts' residential property. According to Knott, when she returned home sometime in the afternoon on September 21, 2001, Defendants Castle and Williams were "[j]ust leaving [her] property." J.A. at 51 (Diane Knott Dep. at 46). Castle and Williams appear to have been standing on or near the driveway when Knott arrived, and Knott stated that she did not see Castle or Williams in her mobile home. In his affidavit, Defendant Castle stated that he and Williams were on "the school property adjacent to the Knott property" and that "[n]either [he] nor Carl Williams entered the Knott residence on September 21, 2001." J.A. at 71 (Castle Aff. ¶ 5). Even construing these facts in the light most favorable to Knott, we cannot conclude that Defendants Castle and Williams violated Knott's Fourth Amendment rights. As we explained in *United States v. Smith*, 783 F.2d 648, 651 (6th Cir. 1986), "[w]hether a driveway is protected from entry by police officers depends on the circumstances. The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy." Here, it appears that the Knott property and the adjoining school building[4] shared the portion of the driveway where Defendants Castle and Williams were standing. Although Knott asserted that Defendants Castle and Williams were on "[her] driveway" and that it was "all private property," J.A. at 51 (Diane Knott Dep. at 46), there is no indication that Defendants Castle and Williams were on the portion of the driveway past the

---

[4]It appears that the neighboring building may have actually housed a church at the time of these events.

school parking lot and near the Knotts' mobile home.  Knott has presented no evidence that entry into the driveway was in any way restricted or that the driveway was hidden from view from public roads.  Hence, we simply cannot conclude on the record before us that entry of summary judgment in favor of Defendants Castle and Williams was in error.

## D.  Liability of Commissioner Mark Sullivan

Defendant Mark Sullivan has moved for summary judgment on the basis that Knott has not alleged that Sullivan, the Athens County Commissioner, participated in any manner in any of the challenged searches and that Sullivan cannot be held liable under a theory of *respondeat superior*.  We agree.  Based upon our review of the record, it appears that Sullivan's involvement in this case came well after the searches at issue in this case.  Indeed, it appears that Sullivan's only action was to respond to a letter from Knott by suggesting that she raise her concerns regarding the Malcolm homicide investigation with the Ohio Attorney General's Office, the Ohio Ethics Commission, the Athens County Prosecutor's Office, and/or the court handling her son's criminal proceedings.  Knott has not articulated how this amounts to a violation of her constitutional rights.  Hence, the district court did not err in entering summary judgment in favor of Sullivan in his personal capacity.  *See, e.g.*, *Miller v. Calhoun County*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) ("Because § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability."); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.) ("[Section] 1983 liability of supervisory personnel must be based on more than the right to control employees.  Section 1983 liability will not be imposed solely upon the basis of respondeat superior.  There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."), *cert. denied*, 469 U.S. 845 (1984).

## E.  Official Capacity Claims

Finally, the Defendants assert that they are entitled to summary judgment to the extent that they have been sued in their official capacities.  We agree.  When government employees like the Defendants are sued in their official capacities, the action "is equivalent to a suit against the entity on whose behalf [the employees] act[]," here Athens County.  *Johnson*, 398 F.3d at 877 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  In turn, a municipality like Athens County "'cannot be held liable under § 1983 on a *respondeat superior* theory.'"  *Id.* (quoting *Monell*, 436 U.S. at 691).  Rather, municipalities incur § 1983 liability only when the plaintiff's injuries are the result of a custom or policy of the municipality.  *Id*.  Thus, in order to survive the Defendants' motion for summary judgment, Knott must demonstrate that there is a genuine issue of material fact as to whether the allegedly illegal searches of her vehicle and residence occurred as a result of a policy or custom of Athens County.  This she has failed to do, and thus we affirm the entry of summary judgment in favor of the Defendants with respect to the official capacity claims.

## III.  CONCLUSION

For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's entry of summary judgment in favor of the Defendants, and we **REMAND** for further proceedings consistent with this opinion.