**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0507n.06
Filed: August 19, 2008

No. 07-3009

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| RAYMOND GIBSON, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| SHELLY CO., | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

**Before: MOORE and MCKEAGUE, Circuit Judges; SCHWARZER,[*] District Judge.**

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Raymond Gibson ("Gibson") challenges the district court's grant of summary judgment for Defendant-Appellee Shelly Co. ("Shelly") on Gibson's discrimination claims under 42 U.S.C. § 2000e-2 et seq. ("Title VII"), 42 U.S.C. § 1981, and Ohio Rev. Code § 4112.02 et seq. On appeal, Gibson asserts that the district court erred in concluding that he failed to make out a prima facie case of either discrimination or retaliation. We conclude that Gibson failed to establish that he was similarly situated to other employees who were not terminated and, therefore, failed to make out a prima facie case of discrimination. Similarly, we conclude that Gibson did not establish a causal link between his termination and the filing of his Equal Employment Opportunity Commission ("EEOC") and Ohio

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

Civil Rights Commission ("OCRC") complaints; therefore, he has failed to make out a prima facie case of retaliation. For those reasons, we **AFFIRM** the district court's grant of summary judgment.

## I. BACKGROUND

### A. Factual Background

Usually, we take the version of the facts provided by the nonmoving party. *See Boone v. Spurgess*, 385 F.3d 923, 925-26 (6th Cir. 2004). However, in this case, Gibson decided to rely largely upon depositions that *Shelly* submitted to the district court in order to establish the underlying facts of this case. Given that Gibson largely adopts Shelly's version of the basic facts, we must do so as well.

Shelly "has produced paving materials and paved roads and highways throughout Ohio. Shelly's Thornville Division consists of 24 modern asphalt plants and 17 sand, gravel, and limestone facilities." Joint Appendix ("J.A.") at 33 (Br. in Supp. of Def.'s Mot. for Summ. J. at 1). In Ohio, Shelly paves roads between May 1 and November 1, approximately. When the road-paving season ends, "Shelly and the other paving companies generally lay off the work crew members, who then collect unemployment benefits during the off-season." J.A. at 55 (Aug. 24, 2006, Aff. of Rob Sharrett ¶ 3).

"When Shelly starts a paving project, it assembles a construction crew by selecting a foreman and then contacting the unions which provide the other types of employees . . . ." J.A. at 55 (Sharrett Aff. ¶ 4). "[E]very time a new crew member reports for work, that crew member receives a copy of the Manual of Safety Practices and Procedures (the "Safety Manual") and is required to sign an acknowledgment form for the Safety Manual. Shelly even follows this procedure with employees who have worked for the Company during prior construction seasons." J.A. at 55 (Sharrett Aff. ¶ 6).

2

Whenever there is a possible safety violation, "[t]he first step in a normal accident investigation is to interview the person(s) involved." J.A. at 129 (Safety Manual at 15). The Shelly Safety Manual states that the "INVESTIGATION must be done as soon as possible," in part because "[p]eople are still available" close to the time of the incident. J.A. at 128 (Safety Manual at 14). One person who is obviously important to the investigation is the employee involved in the incident; the Safety Manual states that investigators should evaluate the emotional and physical disposition of that employee. After the investigation has concluded, evaluation of the incident becomes the responsibility of the Safety Committee:

> The safety committee, after thorough investigation including a conference with the violator, will classify the violation as 'serious' or 'other than serious.' A 'serious' violation is defined as one where there is a substantial probability that death or serious physical harm could result from the violation and the employee knew or should have known of the hazard. An 'other than serious' violation is one that is related to job safety and health but probably would not cause death or serious physical harm.

J.A. at 130 (Safety Manual at 16). The Safety Manual states that "[i]f an employee receives two 'serious' violations within one year, his/her employment will be terminated. Two 'other than serious' safety violations will be equal to one 'serious' violation. Reemployment may be considered one year after termination." *Id.* The Safety Manual also leaves Shelly with the option of deviating from those rules: "In keeping with the employer's employment-at-will policy, an employee's supervisor after consultation with the appropriate general supervisor and the safety committee has the discretion to discharge the employee after any safety violation." *Id.*

According to Rob Sharrett ("Sharrett"), General Manager of Shelly's Thornville division, the Safety Committee is the only body that can terminate an employee for a safety violation. Sharrett

3

also echoed the Safety Manual in noting that "any one serious [violation] can result in a termination, if deemed appropriate." J.A. at 290 (Sharrett Dep. at 81:23-25).

Gibson, a 41-year-old African-American male, is a member of the International Union of Operating Engineers, Local 18. Prior to the events in question, Gibson had worked for Shelly for five years, and according to Gibson's testimony, every year he received a copy of the Safety Manual.

This case involves Gibson's allegations of discrimination and retaliation in connection with his three terminations from Shelly in 2003, 2004, and 2005. We proceed to address each of these terminations in turn.

**1. The 2003 Termination**

In 2003, Gibson was called to work for Shelly as a roller operator. A roller operator controls a large rolling machine that compresses newly laid asphalt. His supervisor at the construction site was Scott Cooperrider ("Cooperrider"). According to Cooperrrider, on May 13, 2003, "[o]n three separate occasions that day I observed Mr. Gibson drive the roller off of the surface where the new asphalt was being laid and directly into the active traffic lane where vehicles were passing through the work area. When this happened, the drivers passing through the work areas had to slam on their brakes in order to avoid a potentially catastrophic collision between their vehicles and the much larger Dual Drum Roller." J.A. at 171 (Aug. 25, 2006, Aff. of Cooperrider ¶ 6).

Driving the roller into traffic was not Gibson's only alleged infraction. According to Cooperrider, "[t]he very next day, a female member of the work crew . . . approached me and complained that Mr. Gibson had made sexually-oriented remarks to her and had engaged in other behavior that made her feel uncomfortable, unsafe and unable to carry out her job duties." J.A. at

4

171 (Cooperrider Aff. ¶ 7). Candace Gales ("Gales"), the Corporate Equal Employment Opportunity Director at Shelly, was called in to investigate the sexual-harassment allegation:

> On May 14, 2003, I received a report that a female employee (Deborah Freeze) had complained that Ray Gibson had made sexually-oriented remarks to her and had engaged in other behavior that made her feel uncomfortable, unsafe and unable to carry out her job duties. I drove to the job site the same day and interviewed Ms. Freeze. I was not able to talk to Mr. Gibson that day. I planned to speak with him the following Monday. In the meantime, I turned over my preliminary findings to Paul Rice, Shelly's General Counsel.

J.A. at 159 (Aug. 24, 2006, Aff. of Candace Gales ¶ 3). Shelly fired Gibson on May 16, 2003, before Gales completed her investigation. Although Gales worked to complete her investigation even after Gibson's termination, at no point did Gales interview Gibson about the alleged harassment.

The exact reasons for Gibson's termination are unclear because Shelly employees gave several contradictory explanations. In a letter, Gales stated that Gibson's termination was not connected to her investigation, noting that Gibson "was removed from the project for SAFETY reasons." J.A. at 162 (July 25, 2003, Gales Letter at 1) (formatting in original). Somewhat contradictorily, however, Gales also wrote that the company attorney "stated that because of the safety issue *and the female complaints* that Ray Gibson should be removed from the job until our investigation was completed." *Id.* (emphasis added). According to Cooperrider, "Shelly decided that it was necessary to terminate Mr. Gibson due to his serious safety violations *and his other misconduct*, so I called Mr. Gibson on May 16, 2003, to inform him of his termination." J.A. at 171 (Cooperrider Aff. ¶ 8) (emphasis added). It is not clear whether the "other misconduct" was the incompletely investigated sexual-harassment allegations. Further complicating the process of investigation of the basis of the 2003 termination is that, according to Dennis Paul, Shelly's Corporate Safety Director, the Safety Committee never considered the decision to terminate Gibson.

5

After he was terminated, Gibson filed a union grievance that eventually went to arbitration. Gibson also filed an OCRC complaint and an EEOC complaint. On February 19, 2004, the OCRC denied Gibson's complaint. On May 21, 2004, Gibson received a right-to-sue letter in response to his EEOC complaint. Gibson, however, did not bring suit within 90 days of his receipt of the right-to-sue letter.

### 2. The 2004 Termination

In June 2004, Gibson's union assigned Gibson to a Shelly-run project. Gibson went to the job site, but after two days, on June 30, 2004, Gibson was terminated. According to David Gentil, foreman at the site, "I did not know that Shelly was still waiting on a decision from an arbitration relating to an earlier termination of him. The next day, I spoke to my boss, who told me that Mr. Gibson was not eligible to work for Shelly at that time due to the pending arbitration case." J.A. at 181 (Aug. 25, 2006, Aff. of David Gentil ¶ 3). General Manager Sharrett explained further: "When the 2004 construction season began in the Spring of 2004, Shelly was waiting on a decision from the arbitrator in a case involving Mr. Gibson's 2003 termination. As a result, Shelly considered Mr. Gibson to be a terminated employee who was not eligible to operate equipment on its job sites at that time." J.A. at 55-56 (Sharrett ¶ Aff. 7). Similarly, in response to Gibson's interrogatories, Shelly stated that "Plaintiff was sent back to the union hiring hall based on the company's understanding that his separation from employment was to remain in effect unless and until the results of the March 2004 [arbitration] dictated otherwise." J.A. at 437 (Def.'s Answer to Pl.'s First Interrogs. ¶ 17).

In response to the 2004 termination, Gibson filed another complaint with the OCRC, this time alleging discrimination and retaliation. On April 14, 2005, the OCRC rejected Gibson's complaint, and the EEOC adopted the OCRC's report.

### 3. The Arbitration Decision

On December 4, 2004, the arbitrator ruled on Gibson's 2003 dismissal. The arbitrator explained that "the [Safety] Committee decided to discharge the grievant for safety violations alone," J.A. at 198 (Arb. Dec. at 11), but noted that "the members of the Safety Committee were aware of the [sexual-harassment] charge and considered its implications," *id.* Later on in the decision, the arbitrator also noted the tension between Shelly's statements indicating that Gibson was terminated in part for the sexual harassment and the fact that Gibson was terminated before Gales's sexual-harassment investigation concluded. Ultimately, the arbitrator determined that Gibson "was terminated without just cause." J.A. at 202 (Arb. Dec. at 15).

In reaching this conclusion, the arbitrator first considered the sexual-harassment allegations and concluded that no just cause supported Gibson's termination for his comments and actions. The arbitrator then moved on to the safety violation and concluded that it was an isolated incident that Shelly never officially labeled as "serious." Thus, the arbitrator awarded Gibson reinstatement along "with full back pay, benefits, and seniority to May 16, 2003." J.A. at 214 (Arb. Dec. at 29).

### 4. The 2005 Termination

"When the construction season began in the Spring of 2005, Shelly recalled Mr. Gibson to work on a paving crew and provided a check for his backpay." J.A. at 56 (Sharrett Aff. ¶ 8). The reunion, however, was short lived as Shelly subsequently terminated Gibson on May 12, 2005, for what it termed "multiple safety violations." *Id.*

During his short stint with Shelly for the 2005 season, Gibson was assigned to Richie Boring's ("Boring") crew. Once again, Gibson was operating a roller. On May 10, because he was unfamiliar with the controls for the particular roller he was operating, Gibson moved his roller too

7

close to the paver machine ahead of him. According to Boring, who was riding the paver, "[h]ad Mr. Gibson come closer by just a few inches, I could have been killed." J.A. at 216 (Aug. 24, 2006, Aff. of Richie Boring ¶ 5). On May 11, at the same job site, Gibson went off the road while on his roller. "[C]rew members observed Mr. Gibson drive the Dual Drum Roller off of the road several times, one time driving almost completely into a ditch." J.A. at 216 (Boring Aff. ¶ 6). Gibson did not dispute that these incidents occurred. As Gibson testified at his deposition, "I looked down to—I had gotten something out of my lunch bucket; and I looked down to close it because it was wedging up against my leg. I looked down to close it. I closed it, and when I looked back up, I was—I could feel the drum on the—on the edge of the asphalt. And I stopped. It slid down the bank, the width of the front drum." J.A. at 93-94 (May 11, 2006, Gibson Dep. at 133:23-134:5). Gibson admitted that he thought that would have been a "serious safety offense." J.A. at 95 (Gibson Dep. at 141:13-22).

Shelly called upon Safety Representative Drake Prouty ("Prouty") to investigate. Prouty investigated the May 10 incident by talking to Boring and other witnesses. Prouty, however, never mentioned speaking to Gibson. Prouty investigated the May 11 incident by visiting the site of the accident and talking to several witnesses; again, there is no indication that Prouty spoke to Gibson. Prouty then provided his report to the Safety Committee. Corporate Safety Director Dennis Paul said that "[t]he Safety Committee evaluated all of the information and concluded that Mr. Gibson had committed two separate serious safety violations on May 10 and May 11 and that his employment should therefore be terminated for that reason in accordance with the provisions set forth in the Safety Manual." J.A. at 140 (Aug. 23, 2006, Aff. of Dennis Paul ¶ 4). At the end of the day on May 12, Boring told Gibson that Shelly had terminated his employment.

8

After his termination, Gibson filed another complaint with the OCRC. On February 2, 2006, the OCRC rejected that complaint as well.

## B. Procedural Background

On September 26, 2005, Gibson filed a complaint against Shelly in the United States District Court for the Southern District of Ohio. Gibson's complaint alleged race discrimination under Title VII, 42 U.S.C. § 1981, and Ohio Rev. Code § 4112.02 et seq.[1] On August 28, 2006, Shelly moved for summary judgment.

In addressing Shelly's motion, the district court did not give deference to the arbitrator's decision. The district court discounted the value of the arbitrator's decision in part because, in contrast to Gibson's complaint, the arbitrator was not focused on race discrimination. J.A. at 472 (Op. and Order at 8) ("The arbitrator's decision, including the arbitrator's summary of the union's position, makes no mention of any issues concerning race discrimination as a factor in plaintiff's termination."); J.A. at 485 (Op. and Order at 21).

Without any reliance upon the arbitrator's decision, the district court proceeded to address whether Gibson made out a prima facie case of discrimination. The district court concluded that Gibson did not show that he was treated differently than non-minority similarly situated employees. "Defendant has presented evidence that Caucasian employees have been terminated for safety reasons," J.A. at 479 (Op. and Order at 15); by contrast, Gibson presented to the district court safety-violation forms that showed that some employees were not fired for their safety violations, but Gibson could not show that the cited employees were non-minorities. In addition, the district court

---

[1]Gibson's complaint also alleged intentional and negligent infliction of emotional distress, but Gibson does not challenge the district court's grant of summary judgment on those claims in this appeal.

found it significant that "[t]he safety violation forms do not show that these employees had the same supervisor as plaintiff." J.A. at 481 (Op. and Order at 17). Also, the district court believed that Gibson's violations were worse than those listed in the safety-violation forms because Gibson drove into traffic multiple times, not just once. Thus, the district court concluded that Gibson could not establish that he was treated differently than similarly situated employees.

In addition to its general conclusion about all of Gibson's discrimination claims, the district court also specifically addressed why Gibson could not make out a prima facie case of discrimination with respect to his 2004 termination. According to the district court, the "plaintiff has produced no evidence that previously terminated Caucasian workers with pending arbitrations were permitted to return to work." J.A. at 482 (Op. and Order at 18).

Although the district court believed that Gibson had not established a prima facie case, it also noted that "defendant has articulated legitimate, nondiscriminatory reasons for the adverse job actions." *Id.* Furthermore, the district court did not find any problem with the fact that Shelly's actions were not entirely consistent with its Safety Manual, concluding that the "plaintiff's termination was not in violation of the Safety Manual" because the Safety Manual allows Shelly to fire an employee for any safety violation. J.A. at 484 (Op. and Order at 20).

Lastly, the district court granted summary judgment to Shelly on Gibson's retaliation claim, concluding that the long period of time between Gibson's complaint in 2003 and the 2004 and 2005 terminations made it difficult to establish a causal connection between the complaint and the terminations.

Thus, the district court granted Shelly's motion for summary judgment. Gibson filed a timely appeal.

10

## II. ANALYSIS

### A.  Standard of Review

"We review de novo a district court's order granting summary judgment." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).  We affirm the district court's grant of summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  If the nonmovant presents evidence that, when viewed in the light most favorable to the nonmoving party, raises a genuine issue of material fact, then summary judgment is inappropriate.  *Wright*, 455 F.3d at 706.

When evaluating Title VII single-motive discrimination claims based on circumstantial evidence, we apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

> This framework first requires that the plaintiff establish a prima facie case.  Once a prima facie case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII.  The defendant then bears the burden of production to put forth a legitimate, nondiscriminatory reason for the complained of adverse treatment.  "The explanation provided must be legally sufficient to justify a judgment for the defendant."  [*Texas Dep't of Cmty. Affairs v.*] *Burdine*, 450 U.S. [248,] 255 [(1981)].  If the defendant meets this burden, the presumption of discrimination created by the prima facie case falls away, and the plaintiff then needs to show that the defendant's legitimate nondiscriminatory reason was a pretext for discrimination.  Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate.

*Wright*, 455 F.3d at 706-07 (citations omitted) (internal quotation marks omitted); *see also White v. Baxter Healthcare Corp.*, ___ F.3d ___, 2008 WL 2607893, at *7-*10, *14 (6th Cir. 2008) (describing the *McDonnell Douglas* framework but noting that it does not apply to mixed-motive

11

cases). "To demonstrate a prima facie case, the plaintiff must show that '(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Wright*, 455 F.3d at 707 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

Although Gibson has alleged violations of Title VII, § 1981, and Ohio Rev. Code § 4112.02 et seq., we consider all of these claims under the same burden-shifting approach and judicial standard of review that we apply in Title VII cases. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004), *cert. denied*, 546 U.S. 821 (2005).

## B. The 2003 Termination

Gibson's complaint and the district court opinion do not consider Gibson's various terminations separately, making it harder to determine Gibson's exact allegations. At oral argument, Gibson's counsel asserted that the 2003 termination was included in Gibson's complaint; we, however, disagree. Gibson's complaint requests only reinstatement "with back pay and all other employment benefits and opportunities back to [J]une 30, 2004." J.A. at 20 (Compl. ¶ 43(B)). Because Gibson failed to bring a lawsuit within ninety days of receiving his right-to-sue letter for his 2003 termination, he is barred from pursuing a Title VII discrimination claim in connection to his 2003 termination. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 460-61 (6th Cir. 2001); *Clark v. Nissan Motor Mfg. Corp. U.S.A.*, No. 97-5956, 1998 WL 786892, at *5 (6th Cir. Oct. 26, 1998) (unpublished); *Banks v. Rockwell Int'l N. Am. Aircraft Operations*, 855 F.2d 324, 325-26 (6th Cir. 1988). Although any state and § 1981 claims involving his 2003 termination would not be barred by the ninety-day limitation, his complaint does not cover his 2003 termination. By requesting

12

backpay starting the day he was fired in 2004, not 2003, it is clear that Gibson foregoes *any* claims arising from his 2003 termination, not just his Title VII claim, which he is barred from pursuing.

Although Gibson does not seek compensation for his 2003 termination, he may still use the 2003 termination as evidence in support of his discrimination and retaliation claims. The Supreme Court has previously held that discrimination that falls outside of the statutory period may nonetheless be used as background evidence. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (holding that for discrete discrimination or retaliation claims, an employee is not barred "from using the prior acts as background evidence in support of a timely claim."). Thus, Gibson's 2003 termination is still relevant for the case before us, even though it is not itself a basis for recovery in Gibson's complaint.

## C. The 2004 Termination

Although it is clear to us that the 2003 termination is not a part of Gibson's current complaint, the status of the 2004 termination is less clear. Gibson's complaint requests reinstatement "with backpay and all other employment benefits and opportunities back to [J]une 30, 2004." By requesting backpay and reinstatement beginning from the moment he was fired on June 30, 2004, it would appear that Gibson's complaint seeks redress for the 2004 termination, a view espoused by Gibson's counsel at oral argument. However, the record before us is not clear as to whether the arbitrator's decision granting reinstatement "with full back pay, benefits, and seniority to May 16, 2003," J.A. at 214 (Arb. Dec. at 29), includes the 2004 construction season. When asked at oral argument, Gibson's counsel thought the backpay award did not cover the 2004 season, but Gibson's counsel then deferred to Shelly's counsel; Shelly's counsel stated that Gibson was fully compensated

13

for the 2004 season.[2] If the arbitrator's order compensated Gibson for the 2003 termination *and* paid him for the 2004 season, then Gibson would appear to be seeking double recovery. *See Reed v. Country Miss, Inc.*, Nos. 93-5594, 93-5649, 1995 WL 348031, at *3 (6th Cir. June 8, 1995) (unpublished).

However, we need not address whether Gibson's complaint as it relates to his 2004 termination might be barred by virtue of his having already received compensation for that construction season. Even if Gibson could establish that he was entitled to additional damages for the 2004 termination above and beyond what he already received, the district court properly dismissed his 2004 termination claims because Gibson failed to make out a prima facie case for discrimination relating to his 2004 termination. As stated earlier, "[t]o demonstrate a prima facie case, the plaintiff must show that '(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Wright*, 455 F.3d at 707. Gibson presented no

---

[2]At oral argument, the following exchange with Gibson's counsel occurred:
Q: "What did that backpay cover? What dates? Did it cover all of 2004?"
A: "I don't believe so your honor."
Q: "Why not? I'm sorry. So you do not believe . . . What dates do you believe the backpay covered?"
A: "I know it covered '03 and it may cover until he could have gone back to work . . . I'm not really sure. Opposing counsel, I'm sure, can clarify that. I know . . . I want to say it was around a year, a year and a half of work."
Shelly's counsel stated in response: "The payments made pursuant to the arbitrator's agreement . . . it represents pay for the time from the 2003 discharge until the reinstatement which took place when the construction season began in 2005. So he received his backpay and benefits for the balance of the 2003 construction season and the entire 2004 season."

evidence that established that Shelly treated him differently than any similarly situated, non-protected employees.

The Safety Manual states that reemployment after termination for safety violations "*may* be considered one year after termination." J.A. at 130 (Safety Manual at 16) (emphasis added). The Manual does not guarantee that an employee will be rehired after one year, and it certainly does not address the status of an employee who is still disputing his termination through union grievance procedures. At the summary judgment stage, Gibson adduced no evidence showing that Shelly rehired employees whose claims were subject to ongoing arbitration hearings. Thus, Gibson has not established that he was treated differently than similarly situated, non-protected employees.

## D. The 2005 Termination

We conclude that the district court did not err in holding that Gibson failed to make out a prima facie case with respect to his 2005 termination.

The question for the district court was whether Gibson presented evidence that Shelly did not fire any non-protected employees who had committed two serious safety violations. The district court correctly concluded that Gibson had not and thus concluded that he failed to establish a prima facie case of discrimination. We agree.

At Gibson's deposition, he presented scant evidence that he was treated differently than similarly situated employees. The most that Gibson provided at his deposition was vague information regarding two individuals who he thought had committed similar offenses and received punishment less than termination. Gibson mentioned Kenny Schneider who "[t]urned over a Rosco broom that was brand new. And I was told he was doing doughnuts in the parking lot." J.A. at 96 (Gibson Dep. at 146:13-19). Gibson also mentioned an unidentified female whose roller went out

15

of control and rolled down a hill. Gibson, however, could offer no specifics as to that incident. Not only were these anecdotes vague, but even if they were true, they did not involve employees who had committed two serious safety violations.

In addition to the statements made at his deposition, Gibson's memorandum opposing Shelly's motion for summary judgment included over 100 safety-violation forms, which documented some limited facts regarding each safety violation and stated the resulting punishment. After reviewing the safety-violation forms, we have identified fourteen incidents that are most similar to Gibson's incidents. We summarize them here:

1. Cooperrider received a written violation for an "other than serious" violation when one of his supervisees operating a roller "accidentally rolled out to the edge of the road and collided with a vehicle" inflicting "major damage" on the non-roller vehicle. J.A. at 313 (June 22, 2004).
2. Cliff Cordial was given three days off without pay for a "serious" violation after he backed up a loader into the truck of another employee. J.A. at 314 (Oct. 25, 2002).
3. Dan Grace received three days off without pay for a "serious" violation when he flipped over a truck while descending a ramp. He was unfamiliar with the location of the engine retarder on the truck, and he was, therefore, unable to slow down the truck as it sped up going down the ramp. J.A. at 333 (Feb. 23, 2006).
4. Eddie Graham received five days off without pay for the "serious" violation of operating a loader near the edge of a 45 foot cliff. J.A. at 335 (Mar. 23, 2004).
5. Tony Likens received two days off work without pay for the "serious" violation of backing up a loader into another truck. J.A. at 361 (Apr. 27, 2005).
6. Tom Maag received two days off work without pay for the "serious" violation of backing his truck into a customer's car. The form notes that it was not Maag's first incident, but the form doesn't state the severity of any prior incidents. J.A. at 367 (Jun. 16, 2004).
7. John Shank received a written warning for an "other than serious" violation when he hit a truck with a loader. J.A. at 399 (Apr. 19, 2004).
8. Almost a year later, Shank received a "serious" violation and five days off work without pay for hitting yet another truck with his loader. J.A. at 400 (Apr. 21, 2005).
9. Shank was then suspended for two days without pay after an "other than serious" violation for another accident a few months later. J.A. at 401 (Jun. 13, 2005).
10. Willie Shaw received two days off work without pay for the "serious" violation of backing into a traffic lane while two tractor trailers were approaching him, and for

16

knocking stones into other employees' cars while operating his tractor. J.A. at 402 (Sept. 7, 2005).

11. Shaw was subsequently terminated after receiving another "serious" violation for driving a roller into traffic. J.A. at 403 (Sept. 29, 2005).

12. Ken Snider received three days off work without pay for the "serious" violation of losing control of his roller, sending it down into a ditch. J.A. at 408 (May 5, 2006).

13. Joe Ulm received one day off work without pay for the "serious" violation of damaging a roller when he backed into another vehicle. J.A. at 418 (Jun. 19, 2004).

14. Gary Watson received one day off without pay for the "serious" violation of driving over a berm pile and getting stuck. J.A. at 421 (Oct. 8, 2004).

What is apparent from this collection of similar incidents is that not one of Shelly's employees committed two serious safety violations and remained with Shelly. In fact, according to the safety-violation forms, the only individual who committed two serious safety violations, Willie Shaw, was terminated following the second violation.[3] On May 10, 2005, Gibson moved his roller within inches of the machine in front of him, risking the life of his supervisor. On May 11, 2005, Gibson drove his roller off the road several times and admitted that that was a serious safety offense. According to Shelly, the company terminated Gibson for these two serious safety violations. Gibson has not provided evidence that anyone else committed two serious safety violations and was not terminated.

The safety-violation reports cannot help Gibson because they provide no evidence that any of the cited individuals–with the exception of Willie Shaw, who *was* terminated–were similarly situated to Gibson. The basis for our holding today is that Gibson presented no evidence of different treatment for other employees with two serious violations. The district court, however, offered several alternative bases for its decision, including that Gibson presented no evidence that the

---

[3]Willie Shaw's September 7, 2005 violation included three seemingly separate incidents. However, the Safety Committee treated the entire day's events as one serious violation. In contrast, Gibson's May 10 and May 11 violations occurred over two separate days.

17

employees listed in the safety-violation forms had the same supervisor as Gibson. That difference in supervisors, however, does not make the employees dissimilarly situated.

In *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992), we held that to be similarly situated "the individuals with whom the plaintiff seeks to compare his/her treatment must have *dealt with the same supervisor*, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 583 (emphasis added). Shelly has latched onto this language to argue that Gibson cannot establish that the cited workers are similarly situated unless he can show that they had the same supervisor as Gibson. Despite Shelly's assertions, we have never held that an equivalence of supervisors was *required* to establish similarity.

> Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted).

In this case, "[c]ommon sense suggests that," *id.* at 353, the identity of the individual supervising Gisbon's work is not a relevant aspect of his employment. At Shelly, termination decisions were not made by Gibson's direct supervisors; rather the decisions were made by the Safety Committee. Even if a supervisor wished to terminate an employee outside of the usual process, Shelly's rules still required the supervisor to consult first with the Safety Committee. Thus,

18

the Safety Committee processes every employee's disciplinary decisions regardless of the identity of the employee's direct supervisor. The district court's focus on the identity of Gibson's supervisor was erroneous. This, however, does not change the fact that Gibson has not identified a single employee with two serious safety violations who was not fired.

Had Gibson established a prima facie case, Shelly would have been obligated to provide a legitimate, nondiscriminatory reason for Gibson's termination, and Gibson would have had the opportunity to show that Shelly's stated reason was simply a pretext. Gibson has provided many reasons to be suspicious of Shelly's stated reason. For instance, with the 2003 termination, Shelly provided contradictory reasons for Gibson's termination (the safety violation and the sexual harassment claim by a co-worker), Shelly terminated Gibson before the sexual-harassment investigation concluded, Shelly never interviewed Gibson about either the safety violation or the sexual-harassment allegation, the Safety Committee did not meet to review Gibson's termination, Shelly did not follow its Safety Manual procedures, and Shelly fired Gibson for at most one serious violation in 2003, not two. Considering that Shelly similarly failed to interview Gibson in connection with the 2005 termination, Gibson has established a worrisome pattern of behavior on the part of Shelly. Despite any concerns that these facts may raise regarding Shelly's motives, Gibson has failed to establish the prerequisite of a prima facie case. We, therefore, affirm the district court's grant of summary judgment on the 2005 termination claims.

### E. Gibson's Retaliation Claim

Lastly, we address Gibson's retaliation claims. The district court assumed that Gibson raised claims of retaliation; however, a review of Gibson's complaint reveals that at no point did Gibson

ever mention retaliation as a cause of action.[4] Despite Gibson's failure to raise explicitly retaliation in his complaint, the district court did not err in considering retaliation claims as part of Gibson's lawsuit. As long as the facts of the complaint give adequate notice, we do not hold against the plaintiff the failure to mention a specific legal theory giving rise to a claim. *See Estate of George ex rel. George v. Michigan*, 63 F. App'x 208, 212 (6th Cir. 2003) (unpublished). In this case, Gibson's complaint noted that he had charged Shelly with retaliation in his OCRC and EEOC complaints, even though he did not list explicitly retaliation as a cause of action in the complaint filed in the district court. Furthermore, the facts that comprise the retaliation claims are present and apparent within Gibson's complaint. Thus, Gibson's complaint gave adequate notice of his retaliation claims, and it was not an error for the district court to conclude that Gibson alleged retaliation claims in his complaint.

"[T]o prevail on a claim for retaliatory discharge under Title VII [based on circumstantial evidence], a plaintiff must first establish a *prima facie* case by demonstrating that 1) the plaintiff engaged in an activity protected by Title VII; 2) the exercise of the plaintiff's civil rights was known to the defendant; 3) the defendant thereafter undertook an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment

---

[4]On August 3, 2006, Gibson filed a motion requesting leave to file an amended complaint. According to the motion, Gibson sought to add explicitly retaliation claims, which would state that "[t]he acts of the Defendant, including but not limited to, the termination of Plaintiff's employment in 2004 and 2005, constitute retaliation against Plaintiff for exercising his legally protected rights under both federal and state discrimination statutes." Docket No. 2:05-cv-888, R. 16 at 5 (Pl.'s Mot. for Leave to File Am. Compl.). Although the district court granted the motion for leave to file the amended complaint, the amended complaint that was entered into the docket was identical to the original complaint in all respects and did not include the retaliation language. We, therefore, address Gibson's retaliation claims without considering the explicit retaliation language that Gibson attempted to add.

action." *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 521 (6th Cir. 2002). "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

In evaluating the merits of Gibson's retaliation claim, the district court concluded that Gibson failed to prove a causal connection between his various OCRC and EEOC complaints, and his terminations in 2004 and 2005. According to the district court, "the circumstances are insufficient to support an inference of retaliation based on mere temporal proximity," J.A. at 492 (Op. and Order at 28), because there was such a long period of time between his protected claims and his termination. We agree that Gibson failed to establish a causal connection between his OCRC and EEOC complaints and his subsequent terminations.

We have never suggested that a lack of temporal proximity dooms a retaliation claim. In fact, we have previously found retaliation when the termination followed the complaint by over a year. *Harrison v. Metro. Gov't of Nashville*, 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled on other grounds by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 (6th Cir. 1999). However, in order to overcome a lack of temporal proximity, the plaintiff must present sufficient evidence supporting the causal connection. "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, *the employee must couple temporal proximity with other evidence of retaliatory conduct* to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (emphasis added). In this case, Gibson has not

presented any additional evidence of retaliatory conduct.  Therefore, we affirm the district court's dismissal of Gibson's retaliation claims.

### III.  CONCLUSION

For the foregoing reasons, we conclude that Gibson did not allege claims seeking recovery for his 2003 termination, and we **AFFIRM** the district court's grant of summary judgment as to Gibson's discrimination and retaliation claims regarding his 2004 and 2005 terminations.